IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **KEVIN JABLONSKY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number |
| **vs.** | ) | **2:04-cv-2414-UWC** |
| | ) | |
| **AMERICAN FAMILY CARE, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**I. Findings of Fact**

1. Plaintiff Kevin Jablonsky is a white male citizen of the United States and of the State of Alabama.

2. Plaintiff was employed by Defendant American Family Care, Inc. On March 31, 2003, as a medical assistant. At all times during his employment, Plaintiff was paid $9.75 per hour; and he worked forty (40) hours per week.

3. Plaintiff was initially assigned to the Defendant's facility in Pelham, (Shelby County) Alabama. While at Pelham, Plaintiff voluntarily associated with the two black employees more frequently than the while employees of the facility.

1

4. Because of his association and friendship with the black employees at Pelham, Plaintiff was referred to as "white chocolate," "wigger," and "ghetto pookey" by one of his fellow employees, John Charles Wingate. On two occasions, Plaintiff reported these references to his immediate supervisor, Louise Alexander. Ms. Alexander took no action on his complaints.

5. Because of his continuing association and friendship with the black employees at the Pelham, Plaintiff was involuntarily transferred by Kay Parks, the director of six of Defendant's facilities,[1] to its facility on GreenSprings Avenue in Birmingham, Alabama.

6. Parks often referred to the GreenSprings facility as "the ghetto clinic." At the GreenSprings facility, there were three white employees (including the physician) and eight to ten black employees.

7. While at GreenSprings, Plaintiff continued to interact extensively with the black employees. It was common knowledge at GreenSprings that Plaintiff was dating a black woman.

8. Judy Pearce, the manager of the GreenSprings facility, deeply resented Plaintiff's association with black Americans solely because of her racial prejudice.

9. In the opinion of Pearce, the word "nigger" is not a racial slur. The

---

[1] Parks was the director of both the Pelham and the Green Springs facilities.

Court credits her clear and unequivocal deposition testimony on this issue:

> "Q    Okay. You said, to you, that word is still not a racial slur?
> A    No.
> Q    The word "nigger" is still not a racial slur in your mind?
> A    No.

*Id.,* p. 14.

    10.   On many occasions between the date of his transfer to the GreenSprings facility and the date of his discharge, Pearce referred to Plaintiff as "ghetto Pookie." .  Todd Smith, a co-employee of Plaintiff, also referred to Plaintiff as "ghetto Pookie" and "white chocolate."  Pearce was present on several occasions when Smith made the comments.

    11.   On May 30, 2003, Pearce told Plaintiff that if he stopped hanging with the blacks and dating a black, he might be able to arrive at work on time.   In fact, Plaintiff had arrived at 8:22 that day, after having explained to Pearce the preceding day that because of a prior commitment, he would not arrive until 8:30.

    12.   On several occasions, when Pearce observed Plaintiff interacting with the black employees and patients at the Green Springs facility, she reassigned him to duties away from the blacks.

    13.   On many occasions, Pearce accused Plaintiff of "acting black." and told him to stop dating black girls.

    14.   The harassment of Plaintiff by Pearce and Smith, based on his association and relationships with blacks,  was  pervasive and severe.

    15.   The racial harassment of Plaintiff by Pearce and Smith detrimentally affected the Plaintiff's performance in the workplace; and it would have affected the  performance of a reasonable person.

    16.   On June, 19, 2003, Plaintiff's black girlfriend brought him his lunch and left the GreenSprings facility.  Shortly thereafter, Pearce called Plaintiff into her office and said to him: "You're a nice young white boy; but you need to quit

hanging around with those black people and dating black females. You will be terminated if you continue to act that way." She then asked Plaintiff if he were bi-racial. Plaintiff arose, and told Pearce that he "didn't have to take" that kind of talk. She replied that if he did not wish to listen to her, he should clock out and go home. As Plaintiff left the room, she told him: "You're fired. Clock out and go home."

17.   The Defendant stipulates that Pearce was its decisionmaker for purposes of this case. Pearce is a higher management official of the Defendant.

18.   Defendant's Exhibits 1, 2, and 3 are unreliable.

19.   After discharging Plaintiff, Pearce contacted the Defendant's Human Resources Department. She falsely reported that she had discharged Plaintiff because 1)a patient complained that Plaintiff had given him the wrong injection, 2)Plaintiff needed to pay more attention to detail , and that he failed to properly document his work; 3) Plaintiff had been disrespectful, had used profanity in front of patients; and that Plaintiff had been warned in the past about his use of profanity. Plaintiff's Exhibit ("PX") 4.

20.   In her trial testimony, Pearce admitted as untrue the reasons for Plaintiff's discharge as reflected in PX 4  -  the only substantially contemporaneous written document reflecting the Defendant's  reasons for the Plaintiff's discharge.

21.   Pearce discharged Plaintiff because of his association and relationships with black Americans, and for no other reason.

22.   Following his termination, Plaintiff diligently sought interim employment.  He has mitigated his damages.

23.   Plaintiff secured interim employment at St. Vincent's Hospital in Birmingham, at a wage rate roughly comparable to his salary at the Defendant.

24.   Plaintiff voluntarily ended his employment at St. Vincent's because of his Masonic obligations. He is not entitled to backpay subsequent to his employent by St. Vincent's.

25.   Plaintiff is entitled to $ 8,140 as back pay.

26.   As a result of his discharge, Plaintiff suffered considerable emotional damages.   He was depressed in the months following his discharge. He was anguished over his inability to find a job and to pay his bills. Plaintiff's telephone was disconnected several times because of his delinquency in paying the bills.

27.   Plaintiff is entitled $25,000 as compensatory damages.

28.   In harassing the Plaintiff, and in discharging him, Pearce acted maliciously and in reckless disregard of Plaintiff's federally protected rights.

29.   The Defendant has not acted in a good faith effort to comply with the nation's anti-discrimination laws by adopting policies and procedures designed to prohibit racial discrimination or harassment in the workplace.

30.   The amount of $30,000 is sufficient to punish the Defendant for its wrongful conduct and to deter others from engaging in similar wrongs.

## II.  Conclusions of Law

1.   This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1981.

2.   The Defendant violated 41 U.S.C. § 1981 by subjecting the Plaintiff to a racially hostile work environment, and by discharging him because of his association and relationships with black Americans.  *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888 (11th Cir.1986).

3. The Plaintiff is entitled to a) reinstatement to his former position with the

Defendant, and an injunction against future discrimination,  b) back pay in the amount of $8,104.00, c) compensatory damages in the amount of $ 25,000, d) punitive damages in the amount of $30,000, e) a reasonable attorney's fee, and f) reimbursement of his expenses and costs,

By separate order, the appropriate relief will be granted.

Done the 23rd day of January, 2006.

_____
U.W. Clemon
Chief United States District Judge